IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ROBBIE M. KOEN, JORDAN HOLDER, RHONDA SUMNLERS, KANEESA MALLORY, and ROMELLO ORR, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 23-cv-2657-DWD |
| vs. | ) | |
| | ) | |
| SOUTHERN SEVEN HEALTH DEPARTMENT and RHONDA RAY, | ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

Before the Court is Plaintiffs' request for a preliminary injunction (Doc. 3), which was the subject of a hearing on November 20, 2023, as well as pre and post-hearing memorandums. (Docs. 3, 97, 98, 100, 101). Therefore, the Court is now prepared to rule. For the reasons explained below, the request for a preliminary injunction is **DENIED**.

## I. Background

Plaintiffs initiated this case on August 1, 2023, when they filed a Complaint for Damages for Racial Discrimination and for Declaratory and Injunctive Relief (Doc. 1). That same day, Plaintiffs also filed an *Ex Parte* Motion for the Entry of a Temporary Restraining Order Without Notice under Federal Rule of Civil Procedure 65(b) (Doc. 3), which requested a temporary restraining order or, in the alternative, a preliminary injunction. The Court denied the aforementioned *Ex Parte* Motion in part and deferred it in part on August 3, 2023. (Doc. 25). More specifically, the Court denied the request for a

temporary restraining order without notice, but deferred ruling on the request for a preliminary injunction. (Doc. 25). The Court indicated it would schedule a hearing on the request for a preliminary injunction at the earliest possible date. (Doc. 25).

Over the course of the next month, however, Plaintiffs attempted to serve each Defendant in advance of a hearing on the request for a preliminary injunction. At a Status Conference held on September 5, 2023, Plaintiffs sought leave to amend the Complaint to dismiss unnecessary parties. (Doc. 74). That request was granted by the Court. (Doc. 74).

### A. Plaintiffs' Amended Complaint and Defendants' Motion to Dismiss

On September 14, 2023, Plaintiffs filed an Amended Complaint for Damages for Racial Discrimination and for Declaratory and Injunctive Relief ("Amended Complaint") (Doc. 84), dismissing one Plaintiff and all but one Individual Defendant. Plaintiff Koen, an African American, is an employee of Defendant Southern Seven Health Department ("Southern Seven") who had been the site supervisor of the Head Start Facility in Cairo, Illinois, since 1996. (Doc. 84, pgs. 2-3). Plaintiff Sumnlers, who is not an African American, and Plaintiffs Mallory and Orr, who are African Americans, have children enrolled at the Cairo Head Start Facility. (Doc. 84, pg. 2). Defendant Southern Seven is allegedly a body politic, incorporated under Illinois law and governed by a board of directors, serving seven counties in southern Illinois. (Doc. 84, pg. 2). Defendant Ray, as the Executive Director of Defendant Southern Seven, is one of Plaintiff Koen's supervisors. (Doc. 84, pg. 3). She reports to Defendant Southern Seven's Board of Directors. (Doc. 84, pg. 3).

Collectively, Plaintiffs allege "Defendants herein decided to close the Cairo Head Start facility for reasons motivated by race as opposed to the implementation of objective criteria." (Doc. 84, pg. 1). According to Plaintiffs, Cairo, Illinois, "is predominately African-American in its racial make up." (Doc. 84, pg. 3). Further, as to Plaintiff Koen, Plaintiffs allege she "received regular raises and bonuses," and was considered "a valuable employee," before 2018. (Doc. 84, pg. 3). Around that time, however, Defendant Ray allegedly joined Head Start. (Doc. 84, pg. 3). She and two other individual employees allegedly made Plaintiff Koen's "life…substantially more difficult." (Doc. 84, pg. 3).[1]

Specifically, Defendant Southern Seven's treatment of the Cairo Head Start Facility, generally, and Plaintiff Koen, specifically, changed in the following ways: (1) Plaintiff Koen "was met with a caustic response" when, in late 2019 or early 2020, she asked the Head Start administrator about a directive regarding the number of enrolled students, "plainly indicating that she was not welcome to ask questions" despite being urged to ask questions about the program in the past; (2) "a campaign of harassment" began against Plaintiff Koen, in July 2020, after learning that a staff member contracted COVID-19 and she, but not Defendant Ray or the Head Start administrator, wanted to inform other employees of that reported illness; (3) Plaintiff discovered the maintenance department was "ignoring work orders," including a work order to replace the windows in the classrooms at the Cairo Head Start Facility, that were delivered to the Head Start administrator; (4) the Cairo Head Start Facility was "consistently" short staffed when

---

[1]The two other individual employees are identified as Defendant Southern Seven's Head Start administrator, Jennifer Parks, and the human resource administrator, Emily Boyd. Neither Ms. Parks nor Ms. Boyd are named as Defendants in the Amended Complaint. (Doc. 84, pg. 3).

employees called in sick because the Head Start administrator "routinely" decided not to send temporary replacements to fill in; (5) after Plaintiff Koen learned, on May 1, 2023, that Defendant Southern Seven planned to close the Cairo Head Start Facility, the Head Start administrator, in a conversation with Plaintiff Koen, the human resource administrator, and a parent, informed the parent that "she and other administrators were unable to speak with Koen and other Cairo staff because Koen had filed grievances and had complained about the closing of the" Cairo Head Start Facility; (6) Plaintiff Koen filed an internal grievance against Defendant Ray on July 26, 2023, after Defendant Ray, "in an aggressive manner and in an attempt to harass and intimidate" Plaintiff Koen, "put her finger near Koen's face and falsely charged her with calling Senators, Representatives, and other stakeholders" to come and view the Cairo Head Start Facility; and (7) Plaintiff Koen was given a notice of lay-off, effective August 4, 2023. (Docs. 3-1; 84, pgs. 3-5).

Plaintiffs allege Defendant Southern Seven, which operates nine other Head Start facilities in southern Illinois where "[t]he children enrolled…are predominantly white in racial background," gave no consideration to closing any of the nine other Head Start facilities. (Doc. 84, pg. 3, 5). Also, Plaintiffs allege "substantial repairs have been and are being done at" the Egyptian, Metropolis, Mounds, and Vienna Head Start Facilities. (Doc 84, pg. 5). Despite budgeted funds for the Cairo Head Start Facility, however, "money is not being spent for repairs in Cairo." (Doc 84, pg. 5). Based on the above allegations, "Plaintiffs allege…[the Cairo Head Start Facility] would still be operating if [it] were located in a city that was predominately white, where the children enrolled are predominantly white, and where the Site Supervisor was also white." (Doc. 84, pg. 5).

4

Relatedly, Plaintiffs allege discrimination by Defendants "against Plaintiff Koen because she is a confident, articulate, and strong woman of African-American descent." (Doc. 84, pg. 5). That discrimination is allegedly related to "the advocacy she took in relation to her questioning [of] Defendants' decision to close…[the Cairo Head Start Facility] by reaching out to elected officials to come and inspect" the Facility. (Doc. 84, pg. 5). In Plaintiffs' view, "Southern Seven employees and officials were resentful of the fact that Plaintiff Koen stood up for the rights of persons of African American descent with regard to…[the] treatment of" the Cairo Head Start Facility. (Doc. 84, pg. 6). The claims arose under 42 U.S.C. §§ 1981 (Count I) and 1983 (Count II). (Doc. 84, pgs. 6-8).

On September 28, 2023, Defendants filed a Motion to Dismiss the Amended Complaint and Supporting Memorandum of Law (Doc. 86) under Federal Rule of Civil Procedure 12(b)(6). After it was fully briefed, the Motion was granted in part and denied in part, resulting in a dismissal of Count I with prejudice. By virtue of this ruling, the Court indicated it would consider the request for a preliminary injunction. (Doc. 94).

### B. Plaintiffs' Request for a Preliminary Injunction and Defendant Southern Seven's Memorandum in Opposition

In the request for a preliminary injunction, Plaintiffs indicate the right in need of protection "is the ability to have quality and affordable day care for small pre-school children." (Doc. 3, pg. 2). Plaintiffs state their interests cannot be measured by money, and the damage inflicted during litigation could never be repaired. That is, Plaintiffs allege the closure of the Cairo Head Start Facility, which occurred on August 4, 2023, will cause irreparable harm since "the families…using the facility have, as a practical matter,

no other place to take their children." (Doc. 3, pgs. 4-5). The families "will be forced to either put their children a[t] risk or will have to forfeit employment." (Doc. 3, pg. 5).

Further, Plaintiffs argue the reason provided by Defendants for closing the Cairo Head Start Facility is a pretext. (Docs. 3, pg. 2; 3-4). Defendants allegedly concluded that the Facility is "in need of repairs that will cost $1,000,000.00." (Doc. 3, pg. 2). However, in Plaintiffs' view, the claim that the Facility is unsafe, absent those repairs, is false. (Doc. 3, pg. 3). They reason, "if the claim were actually believed by the Defendants, they would have shut down the facility at the time they made that assessment." (Doc. 3, pg. 3). Also, Plaintiffs allege, as they did in the Amended Complaint, Defendants have not paid to make repairs at the Cairo Head Start Facility, despite their decision to pay to make repairs at other Head Start facilities. (Doc. 3, pg. 2). Plaintiffs further allege, as they did in the Amended Complaint, the Cairo Head Start Facility is the only Head Start facility with "a predominantly African-American enrollment" and "an African-American Site Supervisor." (Doc. 3, pg. 2). In light of these allegations, Plaintiffs state "[t]he only salient difference between the Cairo facility and the three other facilities…[that] Defendants decided to repair is that Cairo is predominantly African-American." (Doc. 3, pg. 3).

To provide additional support for the allegations and request for a preliminary injunction, Plaintiffs attach the affidavits of Plaintiff Koen, Plaintiff Sumnlers, Plaintiff Orr, and Mr. Wesley Wilson. (Docs. 3-1, 3-2, 3-3, 3-4). Plaintiff Koen's attestations are consistent with the allegations described in the Amended Complaint. (Docs. 3-1; 84).

Plaintiff Sumnlers, who had a child and foster child enrolled at the Cairo Head Start Facility, attests that she moved to Cairo, Illinois, due to her foster child's need for

speech therapy. (Doc. 3-2). Speech therapy was not offered in Mounds, Illinois. (Doc. 3-2). Plaintiff Sumnlers twice inquired about whether speech therapy would now be offered in Mounds. (Doc. 3-2). She never received an answer. (Doc. 3-2). Plaintiff Sumnlers believes her foster child will suffer "a major setback" without speech therapy. (Doc. 3-2).

Plaintiff Orr, who had a child enrolled at the Cairo Head Start Facility, attests that he owns a business with hours of 11:00 a.m. to 11:00 p.m. (Doc. 3-3). The child's mother works from 7:00 p.m. to 7:00 a.m. (Doc. 3-3). Therefore, childcare is needed in the morning and afternoon hours. (Doc. 3-3). The child is not eligible for the public schools in Cairo, Illinois, and no full-time childcare replacement is available. (Doc. 3-3). The closest Head Start facility is in Mounds, but the child "is not familiar with Mounds." (Doc. 3-3). It has been Plaintiff Orr's "experience…that at least twice a month…[he] need[ed] to go to the facility because of some issue or need of…[his] child," and "[i]t would not be practical to do that if she were in Mounds, Tamns [*sic*], or some other place." (Doc. 3-3).

Wesley Wilson attests that he is a general contractor and the sole owner of W.W. Construction, LLC. (Doc. 3-4). Since 2002, Mr. Wilson has performed at least 800 general contractor jobs with bid prices ranging from $1000 to $250,000. (Doc. 3-4). Mr. Wilson twice examined the Cairo Head Start Facility for purposes of preparing a bid for repairs. (Doc. 3-4). Mr. Wilson attested that his construction company could make the repairs to the Cairo Head Start Facility for $187,800. (Doc. 3-4). To do so, Mr. Wilson would need to: (1) remove and replace the existing roof and insulation; (2) remove and replace the exterior paneling; (3) paint certain walls; (4) replace damaged windows in the classroom; (5) repair damaged flooring in the classroom; and (6) install new subflooring and new

flooring throughout other rooms. (Doc. 3-4). Mr. Wilson believed "the estimate of 1 million dollars," provided to Defendant Southern Seven, was "highly exorbitant." (Doc. 3-4). Also, while repairs were necessary, Mr. Wilson believed the Facility was safe for occupancy and the work could be undertaken without closing the Facility. (Doc. 3-4).

In its Memorandum of Law in Opposition (Doc. 97), Defendant Southern Seven argues Plaintiffs are unlikely to prevail on the merits. (Doc. 97, pg. 3). Defendant Southern Seven posits, to prevail on the merits of a claim under the Equal Protection Clause and § 1983, Plaintiffs must do more than prove the closure of the Cairo Head Start Facility had a disproportionate impact on African Americans. (Doc. 97, pg. 3). This is supposedly true even if Plaintiffs can show Defendant Southern Seven could have anticipated that impact. (Doc. 97, pgs. 3-4). Defendant Southern Seven argues Plaintiffs must prove it acted with a discriminatory intent. (Doc. 97, pgs. 4-5). Defendant Southern Seven suggests Plaintiffs will be unable to meet their burden at the hearing, and that the evidence will show the closure of the Cairo Head Start facility was unrelated to race. (Doc. 97, pg. 5).

Further, even if Plaintiffs could prove they are likely to prevail on the merits of Count II due to evidence of a discriminatory intent, Defendant Southern Seven argues Plaintiffs have an adequate remedy at law. (Doc. 97, pg. 5). When doing so, Defendant Southern Seven invokes the Court's prior ruling on the temporary restraining order (Doc. 25) to suggest Plaintiffs' costs, related to the inconvenience of having to find alternative services for their children or to forego employment opportunities, are easily calculable as a legal remedy. (Doc. 97, pgs. 5-6). Defendant Southern Seven states, "[P]laintiffs do not

even allege—much less have evidence to prove—that the services the Cairo Head Start used to provide for them are unavailable anywhere else." (Doc. 97, pg. 5).

Similarly, Defendant Southern Seven argues the "inconvenience[s]," allegedly suffered by Plaintiffs as a result of the closure of the Cairo Head Start Facility, "do[] not equal irreparable harm." (Doc. 97, pg. 6). However, Defendant Southern Seven notes it took "extraordinary efforts" to minimize the impact of that closure. (Doc. 97, pg. 6). For example, Defendant Southern Seven allegedly offered alternative employment to employees who were displaced by the closure and transportation assistance to parents whose children need Head Start services at other locations. (Doc. 97, pg. 6).

Aside from these arguments, Defendant Southern Seven submits that the balancing of harms weighs against a preliminary injunction and is not in the public interest. (Doc. 97, pgs. 1-3, 7-10). Since the Cairo Head Start Facility closed on August 4, 2023, after the Court's denial of a temporary restraining order, Defendants note the relief now sought by Plaintiffs is a mandatory injunction for the reopening of that Facility, which is dangerous and in need of significant and costly repairs. (Doc. 97, pgs. 3, 10).

### C. The Hearing on the Request for a Preliminary Injunction

At the hearing on the request for a preliminary injunction, which was held on November 20, 2023, the Court heard testimony from the following witnesses: Mr. Delbert Irish, the custodian at the Cairo Head Start Facility; Ms. Constance Williams, the mayor pro tem of Cairo, Illinois; Mr. Wesley Wilson, the general contractor who inspected the Cairo Head Start Facility and prepared a bid for its repairs; Plaintiff Orr, the parent of a child who attended the Cairo Head Start Facility; Plaintiff Koen, the site supervisor of the

Cairo Head Start Facility; Mr. Phillip Matthews, a pastor and citizen of Cairo, Illinois; and Ms. Jennifer Parks, the administrator of Defendant Southern Seven's Head Start Program. (Doc. 98). The Court reviewed the hearing transcript, the exhibits admitted at the hearing by stipulation, and the post-hearing memorandums (Docs. 100 & 101) when preparing this Memorandum & Order. As a result of that comprehensive review, the Court adopts the following findings of fact, which are consistent with those proposed by Defendants.

Defendant Southern Seven prefers to operate its Head Start programs in facilities that are owned by local school districts, rather than in stand-alone buildings, because it saves Defendant Southern Seven from incurring expenses related to operating and maintaining the buildings. (Unofficial Hearing Transcript ("UHT"), pg. 113).[2] The Cairo Head Start Facility is a stand-alone building, consisting of 10 connected modular units, that was constructed in 1999. (UHT, pgs. 104, 109-10). The Head Start program operated by Defendant Southern Seven receives all of its funding from the U.S. Department of Health and Human Services ("Department"). (UHT, pgs. 101-02). As such, the Cairo Head Start Facility was built with money from the federal government, such that it has a property interest in the Facility. (UHT, pgs. 103-04). The proceeds of any sale of the Cairo Head Start Facility would have to be repaid to the federal government. (UHT, pg. 104).

The funding to operate Defendant Southern Seven's Head Start program is provided through 5-year grants from the Department. (UHT, pgs. 101-02). The 2022-2023 school year was the end of a 5-year grant period, so a new grant request was required for

---

[2]The Court cites to the Unofficial Hearing Transcript in order to facilitate a more prompt ruling on this matter. However, the Court **ORDERS** the preparation of a certified Official Hearing Transcript, at the Court's expense, that shall be filed on the docket upon its completion.

the next 5 years. (UHT, pg. 101). The cost for Defendant Southern Seven to pay its staff for the Head Start program increased over the last 5 years due to Illinois' minimum wage increases and a desire to keep wages competitive with those of local school districts. (UHT, pgs. 106-07, 112, 126-27). When considering funding for Head Start programs, the Department does not account for changes to minimum wage laws. (UHT, pgs. 106-07).

Jennifer Parks is, and at all relevant times was, the Early Childhood Administrator of Defendant Southern Seven. (UHT, pg. 101). In that capacity, she oversees the Head Start programs operated by Defendant Southern Seven, including by writing grants for the program, working on budgets, ensuring adherence to performance standards and DCFS regulations, and hiring. (UHT, pg. 101). Parks is at the top of the chain of command for Defendant Southern Seven's Head Start program. (UHT, pg. 101).

As the most recent 5-year grant period was ending, it was not "financially possible" to continue running the Head Start program with 97% of its funds going to employee pay. (UHT, pg. 107). A representative of the Department recommended to Parks that Defendant Southern Seven apply for an enrollment reduction grant for the next 5 years, in which it requested the same amount of funding awarded for the prior 5-year period but with a reduction in the number of students being serviced. (UHT, pgs. 107-08, 127). Parks wrote a request for an enrollment reduction grant that requested the same amount of funding that was awarded for the prior 5-year grant period and that reflected a reduction in enrollment by 80 students. (UHT, pg. 127). The proposed reduction in enrollment was based on population changes in the communities where Defendant Southern Seven conducted Head Start programs. (UHT, pg. 131).

When preparing the application for an enrollment reduction grant, Parks had three of Defendant Southern Seven's four stand-alone buildings, *i.e.*, the Head Start facilities in Mounds, Vienna, and Cairo, inspected by a professional building inspector. (UHT, pgs. 115-16). Parks decided not to have the stand-alone site in Metropolis inspected, as it recently underwent a complete renovation by its prior owner. (UHT, pgs. 115-16).

The inspection of the four facilities, including the Cairo Head Start Facility, was conducted by Robert Johnson of RTJ Homes Inspections, LLC, who was referred to Parks by a local real estate agent. (UHT, pgs. 116-17). Parks asked Johnson "to go to the three facilities and do an inspection…[so they] could make a judgment on what needed to be repaired." (UHT, pg. 117). Johnson prepared a written inspection report for the Cairo Head Start Facility, which was presented as Exhibit 100. (UHT, pg. 117; Exhibit 100). Johnson's report noted several major deficiencies with the Cairo Head Start Facility, including a need to completely replace the Facility's roof. (UHT, pgs. 117-19).

Parks asked White & Borgognoni Architects, P.C., with whom Defendant Southern Seven worked in the past, to provide a rough estimate of the cost to repair the deficiencies noted in Johnson's reports for the three facilities. (UHT, pg. 119). This resulted in an estimate of $1,006,000 to repair the deficiencies at the Cairo Head Start Facility. (UHT, pg. 121; Exhibit 101). Defendant Southern Seven spent a total of $86,318.38 on maintenance and improvements to the Cairo Head Start Facility between January 1, 2019, and August 4, 2023. (UHT, pgs. 137-38; Exhibit 109). The estimates for the repairs to the facilities in Mounds and Vienna were $32,000 and $40,000, respectively. (UHT, pg. 122). Parks indicated any work over $250,000 had to be approved by the Department. (UHT, pg. 120).

In March 2023, Jeff Wissinger of Wissinger Construction, Inc., prepared a $100,138 estimate to replace the roof at the Cairo Head Start Facility. (UHT, pg. 120; Exhibit 104). In April 2023, the Cairo Head Start Facility failed a fire safety inspection of the State Fire Marshal that is mandated by the Department, on an annual basis, for licensing. (UHT, pgs. 122-23; Exhibit 112). Upon considering the information provided by Johnson, White & Borgognoni Architects, P.C., Jeff Wissinger, and the State Fire Marshal, Parks included in her request for an enrollment reduction grant a proposal that the Cairo Head Start Facility, and the Head Start Facility in Anna, Illinois, be closed. (UHT, pgs. 129, 139-40; Exhibit 118). Parks believed Anna is primarily Caucasian in racial make-up. (UHT, pg. 129). At a meeting held on April 26, 2023, the Board of Directors for Defendant Southern Seven and the Head Start Policy Council unanimously approved the request for an enrollment reduction grant, including the proposals to close and relocate the Cairo Head Start Facility and to close the Anna Head Start Facility. (UHT, pg. 140; Exhibit 118).

Each family that had children enrolled in the Cairo Head Start program, and who wished for their children to continue in the program, was given the opportunity to enroll their children in the Head Start facility in Mounds or the Egyptian Early Learning Center. (UHT, pgs. 84-86; Exhibit 13). Mounds is around 8 to 10 miles from Cairo. Defendant Southern Seven also offered each family affected by the closure of the Cairo Head Start Facility a 30-day bus pass that could be used to transport their children to one of the other facilities and to conduct other errands, free of charge. (UHT, pgs. 133-34; Exhibit 113). Parks considered the closure of the Cairo Head Start Facility to be temporary, as Defendant Southern Seven was "trying to find another facility" in Cairo. (UHT, pg. 167).

Delbert Irish was a custodian at the Cairo Head Start Facility for around 2 years. (UHT, pg. 5). He stated the windows at the Cairo Head Start Facility would leak when it rained. (UHT, pgs. 6-7). Irish never went on the roof of that building or inspected the interior walls. (UHT, pg. 12). He now works for the Cairo Public Schools. (UHT, pg. 182).

Constance Williams is the mayor pro tem of Cairo. (UHT, pg. 14). In the summer of 2023, she toured the Cairo Head Start Facility at the invitation of Plaintiff Koen. (UHT, pg. 16). Williams was shown problems with the building. (UHT, pg. 20). She did not inspect the roof or the crawlspace. (UHT, pgs. 20, 22). Williams was presented with the $1,006,000 estimate, prepared by White & Borgognoni Architects, P.C., for the Cairo Head Start Facility. (UHT, pgs. 21-22). Williams was told the reason for the closure of the Cairo Head Start Facility was the damage to the building and the cost of repairs. (UHT, pg. 18).

In the summer of 2023, Wesley Wilson, a general contractor, inspected the Cairo Head Start Facility and prepared a bid for the repairs that totaled $187,800. (UHT, pgs. 29-30). Wilson did not include the cost to repair the floor joists or wall cavities. (UHT, pgs. 29-31). He stated the foundation of the building, as shown in photographs in Johnson's inspection report, was not appropriate for a building in which the federal government had a financial interest. (UHT, pgs. 33-34; Exhibit 100).

Plaintiff Orr's youngest child attended the Head Start program in Cairo before the Facility's closure. (UHT, pg. 38). Orr was given the opportunity to enroll his child in the Head Start program in Mounds. (UHT, pgs. 38-39). Orr did not do so, and he instead chose to enroll his child in the pre-K program offered by the Cairo School District. (UHT, pg. 38). Orr believes, when compared to the Head Start program, his child is receiving an

inferior education in the Pre-K program. (UHT, pg. 41). Orr did not avail himself of the opportunity in Mounds because it "was more…of an inconvenience than it would be anything." (UHT, pg. 40). Orr was told by representatives of Defendant Southern Seven that they wanted the Head Start program to remain in Cairo, but that they would need to find another location at which to operate the program. (UHT, pg. 46).

Plaintiff Koen stated there were many problems with the Cairo Head Start Facility, including leaking ceiling tiles and windows that would not stay open. (UHT, pgs. 61-63). After it was announced that the Cairo Head Start Facility was closing, Koen was informed of other employment opportunities, including supervisory positions, with Defendant Southern Seven. (UHT, pgs. 67, 86). Koen did not apply for those opportunities, as she believed they were below her qualifications and offered less pay. (UHT, pgs. 67-68, 86).

If an agency providing services under the federal Head Start program wishes to renovate a building, there is an extensive list of regulations that must be followed. (UHT, pg. 105). Major renovations, such as those over $250,000, must be approved by the Department. (UHT, pg. 105). An appraisal of the Cairo Head Start Facility, conducted in September 2023, revealed a market value of $22,000 for the building. (UHT, pgs. 35, 104).

Defendant Southern Seven does not have the funds to repair the Cairo Head Start Facility, even at the $187,000 price bid by Wilson. (UHT, pg. 141). To secure that funding. Defendant Southern Seven would have to receive a special grant from the Department. (UHT, pg. 141). Parks was informed by a representative of the Department that it would not fund any repairs to the Cairo Head Start Facility. (UHT, pgs. 126-27, 160, 178).

## II. Analysis

A preliminary injunction is an extraordinary remedy that is not granted as of right. *See Doe v. University of Southern Indiana*, 43 F.4th 784, 791 (7th Cir. 2022) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008)). The movant must show: (1) a likelihood of success, and " 'not merely a better than negligible chance' " or possibility of success, on the merits; (2) traditional legal remedies are inadequate, which means "seriously deficient" when compared to the harm, such that there is a likelihood of irreparable harm in the absence of a preliminary injunction; and (3) a showing that the balancing of the equities, *i.e.*, the harm to the parties in granting or denying the preliminary injunction, tips in the movant's favor and advances the public interest. *See id.* (quoting *Winter*, 555 U.S. at 20; *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020)); *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539-40, 545 (7th Cir. 2021) (citing *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020); *Foodcomm Int'l v. Barry*, 328 F.3d 300, 305 (7th Cir. 2003)); *accord Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1187-88 (7th Cir. 2023).

The first and second requirements are threshold inquires, meaning the Court will only proceed to the third requirement if they are satisfied. *See Life Spine, Inc.*, 8 F.4th at 539, 545; *Payton v. Walsh*, 579 F. Supp. 3d 1057, 1061 (S.D. Ind. 2022); *Faust v. Vilsack*, 519 F. Supp. 3d 470, 474 (E.D. Wisc. 2021). The party requesting a preliminary injunction bears the burden of showing an entitlement to that relief. *See Bevis*, 85 F.4th at 1188 (citing *Nken v. Holder*, 556 U.S. 418, 433-34 (2009)). That party need not show a likelihood of success on the merits by a preponderance of the evidence, but he or she "must nevertheless make a 'strong' showing that reveals how it proposes to prove its case." *See id.*; *accord Ill.*

*Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). Also, as alluded to above, "a mere possibility of irreparable harm will not suffice." *See Bevis*, 85 F.4th at 1188; *see also Ill. Republican Party*, 973 F.3d at 763 ("And it is worth recalling that the likelihood of success factor plays only one part in the analysis. The applicant must also demonstrate that 'irreparable injury is *likely* in the absence of an injunction.'") (Emphasis added). It is notable, too, that when assessing the merits of Plaintiffs' claims, the Court does not accept their allegations as true, draw reasonable inferences in their favor, or give them the benefit of conflicting evidence, as is appropriate in other contexts. *See Doe*, 43 F.4th at 791-92 (citing *Alarm Detection Sys., Inc. v. Village of Schaumburg*, 930 F.3d 812, 823 (7th Cir. 2019); *In re Federal Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 134 (D.C. Cir. 2020); *Imaging Business Machines, LLC v. BancTec, Inc.*, 459 F.3d 1186, 1192 (11th Cir. 2006)).

Now, as to the merits, § 1983 states: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983; *see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978) (concluding "[l]ocal governing bodies," like Defendant Southern Seven, allegedly a body politic, "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where…the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers"). The Equal Protection Clause of the

Fourteenth Amendment bars racial discrimination by state and local officials, so persons subjected to such discrimination may seek relief under § 1983. *See Taylor v. Ways*, 999 F.3d 478, 487 (7th Cir. 2021) (citing *Majeske v. Fraternal Order of Police, Local Lodge No. 7*, 94 F.3d 307, 311 (7th Cir. 1996); *Ratliff v. City of Milwaukee*, 795 F.2d 612, 624 (7th Cir. 1986)).

A *prima facie* claim of this nature requires Plaintiffs to show (1) they are members of a protected class, (2) they are similarly situated to members of an unprotected class, (3) they were treated differently than members of the unprotected class, and (4) Defendants acted with a discriminatory intent. *See McPhaul v. Bd of Comm'rs of Madison Co.*, 226 F.3d 558, 564 (7th Cir. 2000), *overruled on other grounds*, *Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013) (citing *Greer v. Amesqua*, 212 F.3d 358, 370 (7th Cir. 2000); *Jackson v. City of Columbus*, 194 F.3d 737, 751-52 (7th Cir. 1999)); *accord Moore v. Freeport Comm. Unit School Dist. No. 145*, 570 F. Supp. 3d 601, 611 (N.D. Ill. 2021); *McDorman v. Smith*, 437 F. Supp. 2d 768, 775 (N.D. Ill. 2006). For purposes of the discriminatory intent requirement, the Seven Circuit has explained as follows: "Discriminatory purpose…implies more than intent as volition or intent as awareness of consequences. It implies that a decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group." *See Nabozny v. Podlesny*, 92 F.3d 446, 453-54 (7th Cir. 1996) (quoting *Shango v. Jurich*, 681 F.2d 1091 (7th Cir. 1982)); *accord Indianapolis Minority Contractors Ass'n, Inc. v. Wiley*, 187 F.3d 743, 752 (7th Cir. 1999). Negligence, for example, will not suffice. *See Nabozny*, 92 F.3d at 453-54 (quoting *Shango*, 681 F.2d at 1091); *accord Wiley*, 187 F.3d at 752.

Further, as to *Monell* liability, Plaintiffs must show a constitutional violation caused by Defendant Southern Seven, allegedly a body politic that "may be held liable for its own violations of the federal Constitution and laws," such as through an express policy, a widespread practice or custom, or a final policymaker. *See Moore*, 570 F. Supp. 3d 601, 611 (N.D. Ill. 2021) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992); *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019)); *First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021). And, as to Defendant Ray, officials in § 1983 lawsuits may only be held accountable for their own misconduct. *See Hess v. Garcia*, 72 F.4th 753, 767-68 (7th Cir. 2023) (citing *Kemp v. Fulton County*, 27 F.4th 491, 497-98 (7th Cir. 2022)); *accord Taylor*, 999 F.3d at 493. In other words, the officials must be personally involved in the constitutional violation and have the specific intent to commit the discrimination. *See Taylor*, 999 F.3d at 493; *see also Thomas v. Chmell*, 569 F. Supp. 3d 732, 737 (N.D. Ill. 2021) ("Individual liability requires personal involvement in the constitutional violation and 'depends on each defendant's knowledge and actions.").

Here, Plaintiffs cannot prevail on the threshold requirements for obtaining a preliminary injunction. First, as to the likelihood of success on the merits of Count II, Plaintiffs failed to make a " 'strong' showing" that either Defendant acted with a discriminatory intent related to the closure of the Cairo Head Start Facility or the treatment of Plaintiff Koen. *See Bevis*, 85 F.4th at 1188; *accord Ill. Republican Party*, 973 F.3d at 762. Instead, there is an abundance of evidence in the record that suggests Defendants were motivated by the significant need for repairs to the Cairo Head Start Facility and the absence of funds to effectuate those repairs. The Court emphasizes, according to the

evidence received at the hearing, the Cairo Head Start Facility was not the only Head Start Facility subjected to an inspection and bidding process for purposes of Defendant Southern Seven's request for an enrollment reduction grant, as suggested by Plaintiffs, because the stand-alone buildings in Mounds and Vienna also went through that process. (UHT, pgs. 115-17, 119, 122). Also, according to the evidence, the Head Start Facility in Anna, which Parks and Defendants believe is predominantly Caucasian, was also closed in the enrollment reduction grant process. (UHT, pg. 129; Doc. 100, pg. 7). This evidence undercuts Plaintiffs' claims that the Cairo Head Start Facility "would still be operating if [it] were located in a city that was predominantly white," such that the "[t]he only salient different…is that Cairo is predominantly African-American." (Docs. 3, pg. 3; 84, pg. 5).

Further, based on the evidence, the Cairo Head Start Facility was in need of more significant repairs and funding for repairs than the stand-alone buildings in Mounds and Vienna. (UHT, pgs. 115-122). The Cairo Head Start Facility's repairs were estimated by Defendants to cost approximately $1,006,000, while the repairs to the Head Start Facilities in Mounds and Vienna were estimated to cost $32,000 and $40,000, respectively. (UHT, pgs. 121-22; Exhibit 101). Even by Plaintiffs' own estimation, which was provided by Mr. Wilson, the repairs to the Cairo Head Start Facility would cost $187,800. (Doc. 3-4; UHT, pgs. 29-30). It is also significant, in the Court's view, that the Cairo Head Start Facility failed a fire safety inspection of the State Fire Marshal that is mandated by the Department, on an annual basis, for licensing. (UHT, pgs. 122-23; Exhibit 112).

Likewise, it is significant to the Court that, although the parties disagree about the extent of the damage and the associated cost of repairs, Parks testified that Defendant

Southern Seven did not have the funds to effectuate *any* repairs, even those bid by Mr. Wilson, and it was her understanding *no funding* would be provided by the Department to repair the Cairo Head Start Facility. (UHT, pgs. 126-27, 141, 160, 178). As recounted above, Defendant Southern Seven's funding comes from the Department and its approval is needed for major renovations. (UHT, pgs. 101-02, 105, 120). Further, contrary to Plaintiffs' claims that "money [wa]s not being spent for repairs in Cairo," but was being spend at other facilities, the evidence suggests Defendant Southern Seven spent $86,318.38 on maintenance and improvements to the Cairo Head Start Facility between January 1, 2019, and August 4, 2023. (Doc 84, pg. 5; UHT, pgs. 137-38; Exhibit 109). Certain evidence also suggests the closure of the Cairo Head Start Facility is temporary, as Defendant Southern Seven desires to operate a Head Start program at another location in Cairo. (UHT, pgs. 46, 167). This evidence suggests Defendants did not act based on race.

In light of the inadequate showing of a discriminatory intent by Defendants, which "implies that a decisionmaker singled out a particular group for disparate treatment and selected his course of action…for the purpose of causing its adverse effects on the identifiable group," the Court finds Plaintiffs have failed to show a likelihood of success on the merits of Count II. *See Nabozny*, 92 F.3d at 453-54 (quoting *Shango*, 681 F.2d at 1104). In so finding, the Court stresses, again, that it is not presented with a motion to dismiss or a motion for summary judgment, where it is appropriate to afford Plaintiffs a certain level of deference when construing their allegations and the evidence. *See* (Doc. 101, pgs. 7-8); *Doe*, 43 F.4th at 791-92; *see also, e.g., Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 767 (7th Cir. 2006) (noting the *McDonnell Douglas* burden-shifting formula for proving

discrimination "is intended for the guidance of the judge when asked to resolve a case on summary judgment"). And, importantly, even Plaintiffs' attorney admitted at the hearing that there is no evidence of overt racial discrimination by Defendants. (UHT, pgs. 1-2).

Second, Plaintiffs failed to show traditional legal remedies are inadequate such that they will suffer irreparable harm in the absence of a preliminary injunction. As the Court noted when denying Plaintiffs' request for a temporary restraining order without notice, the Court has empathy for the families affected by the closure of the Cairo Head Start Facility, who, *inter alia*, allegedly have "no other place to take their children," "will be forced to either put their children at risk or will have to forfeit employment," experienced decreases in the quality of their children's care and education, and encountered inconveniences with the alternatives offered by Defendant Southern Seven. (Doc. 3, pgs. 4-5; 3-2; 3-3). However, the Court remains of the opinion that locating another caretaker or childcare facility, with necessary accommodations, and arranging for greater travel, balancing work responsibilities, and adjusting to new caretaker or childcare settings, as difficult as such challenges may be, do not equate to irreparable harm. *See Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*, 87 F. Supp.3d 874, 895 (N.D. Ill. 2015) ("[M]ere inconvenience does not show that harm would be irreparable.").

Indeed, the evidence indicates Defendant Southern Seven offered the affected children positions at and arranged for free public transportation to other Head Start Facilities. (UHT, pgs. 84-86, 133-34; Exhibits 13, 113). The evidence also indicates certain families are utilizing those accommodations. Plaintiff Orr decided against this option and, instead, enrolled his child in the Cairo Public Schools, which appears to contradict

22

the claim in Plaintiff Orr's affidavit that his child is not eligible for such an alternative option. (Doc. 3-3; UHT, pgs. 38-40). In light of this evidence, indicating the affected children have been offered and/or are utilizing alternatives to the Cairo Head Start Facility, the Court finds the harm allegedly suffered by the Plaintiff parents is compensable through traditional legal remedies, *i.e.*, damages stemming from their inconveniences, and is not irreparable. (UHT, pgs. 84-86, 133-34; Exhibits 13, 113); *Payton*, 579 F. Supp. 3d at 1061 ("The possibility that adequate compensatory or other corrective relief will be available in the ordinary course of litigation[] 'weighs heavily against a claim of irreparable harm.' "). As previously noted, variances in cost related to inconveniences may be recoverable at law. (Doc. 25); *Payton*, 579 F. Supp. 3d at 1061 (" 'Harm is irreparable if legal remedies are inadequate to cure it. [] Inadequate "does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered." ' "); *accord Life Spine, Inc.*, 8 F.4th at 545.

Similarly, the evidence suggests Plaintiff Koen was notified of alternative employment opportunities with Defendant Southern Seven, but that she decided against applying for the available positions. (UHT, pgs. 67, 86). In any event, though, "[o]rdinarily, 'a permanent loss of employment, standing alone, does not equate to irreparable harm[,]' " as "[t]he possibility of reinstatement or backpay at the end of litigation is usually enough to show that preliminary injunctive relief is unnecessary." *See Payton*, 579 F. Supp. 3d at 1062 (quoting *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005); citing *Sampson v. Murray*, 415 U.S. 61, 90, 92 (1974); *Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840, 845 (7th Cir. 2005); *Dos*

*Santos v. Columbis-Cuneo-Cabrini Med. Ctr.*, 684 F.2d 1346, 1349 (7th Cir. 1982); *Shegog v. Board of Educ. of City of Chicago*, 194 F.3d 836, 839 (7th Cir. 1999)). As such, the Court finds any harm suffered by Plaintiff Koen is compensable through traditional legal remedies, such that she will not suffer irreparable harm absent a preliminary injunction.

Since Plaintiffs failed to carry their burden on the threshold requirements for a preliminary injunction, the Court will not proceed to the next step of the analysis.

### III. Conclusion

As explained above, Plaintiffs' request for a preliminary injunction is **DENIED.**

**SO ORDERED.**

Dated: December 28, 2023

_____
DAVID W. DUGAN
United States District Judge